**STANDARD TITLE INSURANCE COMPANY, a corporation, Appellant,**

v.

**Donald F. ROBERTS, Appellee.**

**No. 17845.**

United States Court of Appeals
Eighth Circuit.

Aug. 17, 1965.

Donald W. Giffin, of Spencer, Fane, Britt & Browne, Kansas City, Mo., made argument for appellant and filed brief with Joseph J. Kelly, Jr., of Spencer, Fane, Britt & Browne, Kansas City, Mo., and C. Wayne Litchfield, of Savage, Gibson, Benefield & Shelton, Oklahoma City, Okl.

Donald G. Stubbs, of McKenzie, Williams, Merrick, Beamer & Stubbs, Kansas City, Mo., made argument for appellee and filed brief.

Before VOGEL and BLACKMUN, Circuit Judges, and REGISTER, District Judge.

REGISTER, District Judge.

This is a suit on a written guaranty of a corporate note, such note being executed by the appellee, individually, at a time when he was the president and sole stockholder of the corporate debtor. Trial was had before The Honorable Richard M. Duncan, sitting without a jury.

Plaintiff in the original complaint was Patrons Cooperative Bank, the named obligee in the written guaranty. Subsequently, an amended complaint was filed, in which the appellant, Standard Title Insurance Company, was added as a party plaintiff. After all the evidence was received at the trial, the original plaintiff was dismissed upon the basis that it was not a real party in interest. Appellee filed an answer to the amended complaint after which appellant filed a reply thereto, alleging in substance that appellee was estopped from relying on certain pleaded defenses by reason of conduct allegedly constituting fraud. Following the issuance of the trial court's memorandum opinion, findings of fact and conclusions of law, judgment was entered in favor of appellee on June 3, 1964. Thereafter the trial court overruled appellant's after judgment motions, and appeal to this court followed.

The facts necessary and relevant to a lucid understanding of the issues presented by this appeal are correctly and adequately stated by the trial court in its comprehensive Memorandum Opinion, Findings of Fact and Conclusions of Law (unreported), as follows:

"Patrons Cooperative Bank, a corporation, duly organized under the laws of the State of Kansas, with its banking house in the City of Olathe, in the State of Kansas, instituted this suit in this court on July 26, 1961, against the Investment Corporation of Missouri, a corporation, and Charles I. Hayes, Donald F. Roberts and Richard E. Kerns, all residents and citizens of the State of Missouri, to recover the sum of $26,570.14, together with interest from October 29, 1960, which amount was the balance due on a promissory note executed by the defendant Investment Corporation of Missouri, and upon the written agreement of the defendants Hayes, Roberts and Kerns personally guaranteeing the payment of the note.

"The material facts as to the various transactions from which the con-troversy arose, are not in serious dispute.

"During the year 1960, the defendant Roberts and his associates were engaged in the development of subdivisions and the erection of houses therein in and around Kansas City, operating through numerous corporations which were controlled by the defendant Roberts; the other two defendants were officers of the corporations, but they controlled no stock.

"On February 1, 1960, Lubben & Sauer Builders, Inc., entered into a contract to sell to 'Donald F. Roberts (or his assignee)', Lots 1 to 16 inclusive East Fox Woods, a subdivision in Kansas City, Clay County, Missouri, for the agreed price of $40,000.00; $20,000.00 was to be paid upon the signing of the contract, and $8,000.00 on the delivery of the deed and the execution of a promissory note in the sum of $30,000.00 for the balance.

"Thereafter, Lubben & Sauer executed its deed to The Woodridge Corporation to such lots, and on May 25, 1960, the Woodridge Corporation through its president, Donald F. Roberts, executed its promissory note to Lubben & Sauer Builders, Inc., in the sum of $30,000.00, due not later than June 1, 1961, secured by deed of trust signed by the said The Woodridge Corporation, on all of the lots described aforesaid. This deed of trust was duly recorded in the office of the Recorder of Deeds in and for Clay County, Missouri.

"During the Summer of 1960, Charles I. Hayes, contacted Mr. Osborn, an officer of the Patrons Cooperative Bank, exploring the 'possibility of establishing a line of credit for warehousing construction loans at his bank', to the Investment Corporation. The amount sought was $100,000.00. Numerous conferences were held between Osborn and Hayes with respect not only to the amount sought to be borrowed, but also as to the security to be provided for the payment of the note.

"One of the obstacles to making the loan of $100,000.00 was that the deposits of the Bank were not sufficient to enable it under the laws of Kansas, to lend that amount of money to one borrower. To overcome this obstacle, Roberts obtained a certificate of deposit from B. C. Morton & Company of Boston, in the sum of $200,-000.00 which he caused to be deposited in the Patrons Cooperative Bank, thus making it eligible under the law, to make the loan, and the bank agreed, upon providing certain securities, to make the loan.

"All of the negotiations were conducted by Hayes but he kept Roberts advised as to the progress of the transaction, and as to the terms thereof.

"In anticipation of its use as collateral, The Woodridge Corporation did on September 16, 1960, execute eight promissory notes to the Investment Corporation, six of them in the sum of $12,900.00 and two in the sum of $12,500.00, aggregating $102,-400.00, and simultaneously therewith, executed deeds of trust on eight of the lots above described. These deeds of trust did not recite the prior deed of trust executed by The Woodridge Corporation to Lubben & Sauer Builders, Inc. All of these deals were duly recorded in the office of the Recorder of Deeds of Clay County, Missouri.

"In negotiations between Hayes and the Bank, it was agreed that title insurance would be obtained on the lots described in the deeds of trust from The Woodridge Corporation to the Investment Corporation, and that said deeds of trust and the title insurance policies would be assigned to the Bank as collateral for the loan. These title policies would guarantee that houses would be built on the lots, and that they would be free from mechanics liens.

"As additional security, it was also agreed that Roberts, Kerns and Hayes would execute their personal guarantee for the payment of the note.[1]

"1. 'GUARANTY OF CORPORATION INDEBTEDNESS

For good and valuable consideration, the receipt whereof is hereby acknowledged, the undersigned stockholders and officers of the INVESTMENT CORPORATION OF MISSOURI, a corporation, do hereby guarantee the prompt payment when due of all indebtedness now owing by said corporation to the Patrons Co-Operative Bank of Olathe, Kansas, as evidenced by said corporation's note or notes including any renewal or extension thereof, and we do further guarantee payment when due of any future indebtedness which may hereafter be incurred by said corporation with said bank and hereby acknowledge that we are and shall be personally liable therefor.

This personal guarantee for payment of said corporation's indebtedness to said bank, shall remain in force until revoked by the undersigned in writing, it being agreed, that any such revocation shall not effect the personal liability of the undersigned for such corporation's indebtedness which may be owing at the time of such revocation or any renewal or extension thereof.

Dated this 26th day of September, 1960
/s/ Donald F. Roberts
/s/ Charles I. Hayes
/s/ Richard E. Kern
Officers and stockholders of the above designated corporations'

"In pursuance of this arrangement, on September 27, 1960, the Investment Corporation by Roberts, its president, and Kerns, its secretary, executed a promissory note in the sum of $102,-400.00 to the Bank, due six months after date. The note recited that it was secured by deeds of trust on Lots 3-4-5-6-11-12-13 and 14 in East Fox Woods Addition. It did not recite the personal guarantee. The deeds of trust were duly assigned to the Bank and $100,000.00 was placed to the credit of the Investment Corporation of Missouri.

"Hayes says in his deposition, and there is no denial of it, that at the time the note was signed and delivered to the Bank, he obtained from it the form of written guarantee which he returned to Kansas City, Missouri, for

signature by the parties, and that after it had been signed, he either delivered it personally to the Bank, or mailed it from Kansas City. He is not positive by what method it was returned to the Bank.

"At the time the loan was made, it was verbally understood that the proceeds of the loan would be used only in payment of construction costs of houses to be erected on the lots described in the deed of trust. The Plaintiff, Standard Title Insurance Company had knowledge of this arrangement, but there is no evidence as to whether or not Roberts had such knowledge. However, owing to the fact that he had been kept advised by Hayes as to all other details of the loan, it may reasonably be assumed that he knew about this arrangement.

"The title insurance policies were written by Standard Title Insurance Company through its wholly owned subsidiary, The Platte County Title Corporation. Dan Hayes (no relation to Charles I. Hayes) was the agent for the Title Insurance Company.

"A few days after the crediting of the amount of the loan to the account of Investment Corporation of Missouri, the said Investment Corporation through Roberts, withdrew $25,000.00 and deposited it in the account of The Woodridge Corporation.

"Later investigation revealed that no part of this money had been used to pay construction costs. Roberts was an extensive operator and had other interests in other corporations. It is not clear from the evidence just what became of this money. Hayes stated that $12,000.00 of the amount was used by Roberts to pay a commission on a certificate of deposit in the sum of $400,000.00 obtained from B. C. Morton & Company, and credited to the account of Roberts in another bank. What became of the balance of the $25,000.00 is not clear from the evidence. Whether or not it got into the account of another corporation controlled by Roberts, we are not able to determine.

"Upon determining that the $25,000.-00 withdrawn from the account had not been properly used, the Bank refused to honor any further checks drawn against the account of the Investment Corporation and the $75,000.-00 remained to its credit until the note became due.

"Sometime prior to the due date, the Bank notified the parties that the note would not be renewed and to make arrangements for payment. At this time Roberts notified the Bank that he had sold his interest in both corporations to Hayes, and that under the agreement, it was Hayes' responsibility to see that the note was paid. When it was not paid, the Standard Title Insurance Company was duly notified and it paid to the Bank the difference between the $75,000.00 then remaining in the account and the amount then due together with interest. The back of the note bears the following:

"6/26/61 Paid by Standard Title Company $26,024.00 and interest of $1,571.00.'

At the time the note was paid, the Bank and the Title Insurance Company entered into a written agreement providing that the Bank would, and it did, assign to the Title Insurance Company all of the collateral received by it at the time the loan was made, including 'the personal guarantee and other security therefor'.

Further agreed:

'that Standard shall have all the rights and causes of action which it has against any person, persons or corporations whatsoever arising out of said note, personal guarantees or other security given therefor.'

The Bank further agreed to:

'authorize Standard to sue at its expense in the name of the Bank and such third party, and agrees to give its full cooperation in said action.'

"On July 26, 1961, pursuant to this agreement, suit was brought in the Bank's name against the Investment Corporation, Hayes, Roberts and Kerns

to recover the sum of $26,570.14, the amount then due, together with interest.

"The Complaint alleged the execution of the note by the Investment Corporation, its failure to pay, and the execution of the personal guarantee by the individual defendants. Copies of the note and agreement were attached to the Complaint. All of the defendants answered, but defendants Investment Corporation, Hayes and Kerns did not appear thereafter for trial and default judgments were rendered against each of them.

"In his answer, Roberts alleged that the Bank was not the real party in interest, but that the plaintiff, Standard Title Insurance Company was the real party in interest. He also alleged that the plaintiff was required to exhaust its collateral, or in the alternative, that the defendants were entitled to it.

"On July 25, 1963, plaintiff filed an Amended Complaint making the Standard Title Insurance Company a plaintiff, and omitting all the other defendants, except Roberts. The amended complaint repeated all of the allegations contained in the original complaint concerning the execution of the note by the Investment Corporation of Missouri, and the execution of the guarantee by Roberts. The Amended Complaint also alleged the assignment of the collateral and the guartee.

"In his answer to the Amended Complaint, Roberts demanded exhaustion of the collateral and further alleged that the note had been paid and discharged.

"Upon trial of the case to the court, at the close of plaintiff's evidence, the court dismissed the Bank on the ground that it had no interest in the subject matter of the suit after the note had been paid.

"Subsequent to the assignment of the collateral to the Standard Title Insurance Company, it proceeded to foreclose in accordance with the terms of the deeds of trust. The trustee duly advertised the lots for sale, and at the trustee's sale, the Platte County Title Insurance Company (Standard's wholly owned subsidary) became the purchaser for each of the lots for the sum of $200.00 each.

"There was no evidence that Standard Title was guilty of any lack of good faith in the foreclosure proceedings, or that the collateral was worth more than the amount received for it.

"Defendant did not complain that Standard Title had not exhausted its collateral or received a fair price for it at the foreclosure sale, and he cannot now complain that the collateral had not been properly disposed of and the proceeds credited to the payment of the obligation."

The complaint in this action was filed on July 26, 1961. Thereafter and prior to date of trial (January 14, 1964) all pretrial proceedings had been completed; this included the taking of depositions, propounding and answering written interrogatories, filing of motion for summary judgment by appellee, pretrial conference, request for admission of certain facts filed by appellee, and the filing of the respective pleadings. The case was fully tried on January 14, 1964. Following submission of all of appellant's evidence, the appellee stood on his motion for a directed verdict and the case was taken under advisement by the Court. Both parties thereafter filed briefs.

On March 2, 1964, while the case was under advisement and after all briefs had been submitted, appellant filed its Motion for Leave to Amend Amended Complaint. The trial court's opinion, findings, and order for judgment were filed on June 1, 1964; judgment, as heretofore stated, was entered on June 3, 1964.

Appellant contends that the trial court "erroneously refused to consider the complaint amended so as to conform to the evidence with regard to issues of indemnification which were tried by express and implied consent of the parties". In support of this argument appellant relies

on Rule 15(b), Federal Rules of Civil Procedure. Said rule provides, insofar as is here applicable, that:

"When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues."

Appellant points out that the first sentence of Rule 15(b) is mandatory in its terms. With reference to this position, Professor Moore has stated:

"It should be noted that Rule 15(b) is not permissive in terms: it provides that issues tried by express or implied consent *shall* be treated as if raised in the pleadings. * * *" 3 Moore's Federal Practice, Ch. 15.13 (2), p. 996.

Professor Moore also refers to this portion of the rules as a "directive" which "has been applied over and over again by the courts" (Moore's, supra, p. 983), a conclusion supported by a large number of cases therein cited. Appellant's reasoning is:

a. The first sentence of Rule 15(b) is mandatory in its terms;

b. The issue of its (appellant's) right to indemnification from appellee was tried by the express and implied consent of the parties; and

c. The directive contained in said rule was ignored by the trial court in its refusal to grant appellant's motion to amend, and reversible error was thereby committed.

Appellee contends that this portion of the rule is not applicable for the reason that the issue raised by the proposed amendment was *not* tried.

In order to determine this question it is necessary to examine and analyze the status of the pleadings at the time of trial, the record of the trial, and the posture of the case at the time of filing the motion to amend. In this respect, it will be helpful to reiterate some of the pertinent facts.

The sole cause of action alleged in the amended complaint was based on a written guaranty. In his answer the appellee asserted, as a defense, in paragraph 4 thereof, that the note involved was secured by certain collateral (notes secured by deeds of trust and guaranteed by title insurance policies) and that appellant was required by law to exhaust such collateral before proceeding against the appellee, or that appellee was entitled to the benefit of the collateral and, in paragraph 5, that said note had been fully paid and discharged. Appellant's reply to appellee's answer consists of eight paragraphs: Paragraph 1 is a general denial; each of the other paragraphs states that it is in reply to paragraph 4 of the answer. All of the allegations contained in the reply are asserted to be the basis upon which appellee should be estopped from requiring appellant to exhaust or look to that portion of the collateral represented by the title insurance policies. In substance, appellant asserts in its reply that appellee was guilty of a specific act of fraud in knowingly and falsely representing to the appellant that said title insurance policies insured first deeds of trust upon land described therein (when in fact he knew or should have known said land was then subject to a prior and superior deed of trust) and, also, that appellee received $25,000 withdrawn from a certain bank account in violation of an existing understanding and thereby became unjustly enriched.

Upon the issues as thus framed by the pleadings, the case proceeded to trial. During the course of the trial, the prior deed of trust and note secured thereby were offered and received as exhibits, by stipulation, and the real estate contract which was partially satisfied by the giving of such prior deed of trust was received in evidence as an exhibit without objection. Direct and cross-examination of two of appellant's witnesses were relat-

ed to these exhibits, (viz., that said prior deed of trust was, at the time of the transaction involved and for several months prior thereto, of public record); to the question of whether the prior note and deed of trust were, in fact, known to the policy-signing agent of the appellant; to the withdrawal of the sum of $25,000 from the bank, and the deposit thereof in the account of the Woodridge Corporation; and to the use to which said sum, or a portion thereof, was put.

As previously stated, the trial was completed on January 14, 1964. Appellee offered no evidence, but stood on his motion for directed verdict. On March 2, 1964 appellant filed its Motion for Leave to Amend Amended Complaint, which amendment proposed to add the following paragraph to the Amended Complaint:

"8. Defendant (appellee) is legally obligated to indemnify plaintiffs (appellant) for their loss by reason of defendant's active negligence and misconduct in connection with said transactions, and for the further reason that defendant has made possible the loss sustained by plaintiffs."

Appellant contends the record establishes "that the issue of its right to indemnification from defendant was submitted and tried by the express and implied consent of the parties at the trial", and emphasizes that portion of the record relative to the admission of the exhibits heretofore referred to in support thereof.

We do not agree with such contention; a careful reading of the trial record discloses that the case was tried on the issues as they existed under the pleadings at the time of trial. The alleged claim of liability against appellee was based solely on the written guarantee; to such alleged liability appellee pleaded specific defenses, in his answer. Appellant's allegation in its reply, with respect to alleged fraud and negligence on the part of appellee, was directed specifically to certain defenses pleaded in the answer, and was for the expressed sole purpose of estopping appellee from claiming the benefit of such defenses. Thus, the only issue as to alleged fraud and negligence arose from the answer and reply thereto, and related exclusively to whether appellee should be estopped from relying upon specific, pleaded defenses. The record clearly reveals that the evidence concerning the prior deed of trust was relevant and material to the specific issue raised by the reply and answer. The proffered amendment set forth a completely new cause of action, based on a wholly different theory from that alleged in the amended complaint. The fact that the evidence submitted and received at the trial, on the then existing issue raised by the answer and reply, would have been relevant and admissible in the trial of such new cause of action does not mean that the latter was tried by the express or implied consent of the appellee. We deem it significant that the trial court, in its memorandum opinion, referred to the "guaranty itself" as being "the real subject matter of this lawsuit", and said: "Simply stated, in the action before this court, the Plaintiff must recover upon the written guaranty or not at all.", and, further, "This is not a suit in equity, nor is it an action in tort to recover from the defendant for his wrongdoing". In effect, the trial court held that the appellant had failed to prove facts necessary to establish estoppel and in his after-trial remarks (contained in the trial record), after referring to specific "plaintiffs' own evidence", said: "* * * that, by itself, I say, *defeats the claim of fraud which they have made in their reply*." (Emphasis supplied.)

Professor Moore, again, with reference to Rule 15(b), says:

"The purpose of an amendment to conform to proof is to bring the pleadings in line with the actual issues upon which the case was tried; therefore an amendment after judgment is not permissible which brings in some entirely extrinsic issue or changes the theory on which the case was actually tried, even though there is evidence in the record—introduced as relevant to some other issue—which would support the amendment. This principle is sound, since it can-

not be fairly said that there is any implied consent to try an issue where the parties do not squarely recognize it as an issue in the trial." Moore's, supra, pp. 991, 992. Also see: Gallon v. Lloyd-Thomas Company, 8 Cir., 264 F.2d 821, 825, n. 3, 77 A.L.R.2d 417.

While the controlling general rule of law is well established and not in dispute, the necessity of considering the evidentiary facts in each case in order to determine the applicability of such rule is easily demonstrated. In three of the opinions of this Court cited by the appellant—Lientz et al. v. Wheeler, 113 F.2d 767; Franklin v. Columbia Terminals Co., 150 F.2d 667; and Vogrin v. Hedstrom, 220 F.2d 863, cert. denied, 350 U.S. 845, 76 S.Ct. 86, 100 L.Ed. 753—the trial record was carefully analyzed, and each of said decisions was based partially upon the fact that the party against whom the amendment was sought had taken affirmative action, during the trial, in connection with the introduction of evidence on the issue pertinent. In Vogrin, supra, it is stated (with reference to the vital evidence) at page 866:

"The only evidence introduced was introduced by the plaintiff and * *

She, of course, could not be heard to say that the evidence was not addressed to a pertinent issue."

In Franklin, supra (150 F.2d at page 672, on petition for rehearing) in discussing the evidence concerning the theory upon which the case was actually tried, this Court said:

"On the trial, however, the theory of Columbia's liability, * * * was developed from the evidence of the witnesses for both parties, the evidence having been received without objection or limitation of purpose in its admission."

And in Lientz, supra, 113 F.2d at page 769, in referring to the evidence received at the trial and which was to be considered in the determination of the motion to amend, we said:

"Both parties upon the trial contributed to the production of such evidence. The evidence was not objected to on the ground that it was not within the issues. *It is a fair inference from the record that the parties impliedly consented to try the issue upon which the court's finding rests.*" (Emphasis supplied.)

There is absolutely nothing in the record before us which would support an inference of such consent by implication, on the part of appellee, as is urged by appellant.

It is abundantly clear to us that this case was tried on the written guaranty theory; that appellant relied upon such guarantee as its basis for recovery; that such was the real issue actually litigated (as to liability) and was so understood by the parties and the trial court; and that this issue was that upon which the trial court's findings and determination rests. This latter conclusion is inescapable in view of the concluding paragraph of the trial court's memorandum opinion, which states:

"The Plaintiff has demonstrated no right to recover on the guaranty under either the laws of the State of Missouri, or of Kansas, and therefore the judgment must be and is for the Defendant."

By the proffered amendment appellant sought to abandon the trial theory and substitute a cause of action alleging tort and unjust enrichment as the basis for its right of recovery. We are satisfied that appellant has failed to bring itself within the procedural aspects of Rule 15(b).

Appellant next contends that "Even if the Court should find that the issue of indemnification was not tried by the express or implied consent of the parties under Rule 15(b) * * * the Court, nevertheless, abused its discretion in tacitly denying plaintiff's Motion for Leave to Amend Amended Complaint because

justice required that the amendment be allowed in this instance." Reliance is placed upon Rule 15(a).[1] No formal order denying appellant's Motion to Amend appears of record; however, it is clear that said motion was tacitly denied by virtue of the trial court's decision, adverse to appellant, on the merits.

■ The federal courts have generally and consistently recognized that, as a general rule, amendments under Rule 15 should be allowed with liberality. Thus, this Court, in Robbins et al. v. Jordan, 86 U.S.App.D.C., 181 F.2d 793, at page 794, said:

> "As was said in International Ladies' Garment Workers' Union v. Donnelly Garment Co., 8 Cir., 1941, 121 F.2d 561, 563: 'The Supreme Court of the United States has fixed the limits of permissible amendment with increasing liberality and has ruled that a change of the legal theory of the action is no longer accepted as a test of the propriety of a proposed amendment * * * Rule 15 of the Rules of Civil Procedure * * * expresses the same liberality with respect to the amendment of pleadings.' "

In fact, an entirely new cause of action may be introduced by way of amendment under some circumstances. See: Union Pacific R. Co. v. Wyler, 158 U.S. 285, 295–297, 15 S.Ct. 877, 39 L.Ed. 983 (referred to in International Ladies' Garment Workers' Union, supra, 121 F.2d at page 562).

■ However, the action to be taken on such a motion is within the sound discretion of the trial court and whether that court is guilty of a clear abuse of discretion in denying such a motion depends upon the facts of the case. In Caddy-Imler Creations, Inc. v. Caddy, 9 Cir.,

299 F.2d 79, at page 84, the Court concluded:

> "Under the facts of this case, there was no clear abuse of discretion in the trial court's refusal to change the entire legal theory of the case after the introduction of all evidence was complete."

An excellent and concise summary of the law on this point is found in the opinion of this Court in Gallon, supra, 264 F.2d at page 823, expressed in the following language:

> "While, in general, Rule 15 of the Federal Rules of Civil Procedure contemplates that amendments to pleadings should be allowed with liberality where necessary to bring about furtherance of justice and where the adverse party will not be prejudiced, it is a settled rule of practice that the trial court is vested with sound discretion in granting or refusing an amendment to pleadings, and the extent of this Court's review is limited to the question of abuse of this discretion. (Citations)."

The factual situation which existed in Gallon is closely analogous to that of the instant case, as is the nature of the questions on review, and much of the reasoning of this Court therein is applicable to the questions here presented.

■ In this case the proposed amendment was submitted, some two and one-half years after the filing of the original complaint; one year and eleven months after the filing of the amended complaint; and more than six weeks after the trial had been completed and the case taken under advisement by the trial court. It in effect would have introduced a new cause of action, based on an entirely different theory than that upon which the case had been tried. The tactics and

---

1. Rule 15(a), Fed.Rules of Civ.Procedure, provides as follows: "A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the

trial calendar, he may so amend it at any time within 20 days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party; *and leave shall be freely given when justice so requires.* * * *" (Emphasis supplied.)

strategy of the appellee at the trial were doubtless dictated by the then existing state of the pleadings and record—as is indicated by the fact that, following completion of the appellant's proof, the appellee stood on his motion for directed verdict. When the Motion to Amend was made the trial court may have considered the necessity of a partial retrial, and the extent thereof, in event the same be granted. If a cause of action existed against the appellee in favor of the appellant upon the basis of tort, unjust enrichment, or some other equitable basis, the same could be litigated by institution of a proper action. Appellant has, in our opinion, failed to demonstrate that, under the facts of this case, the trial court abused its discretion in tacitly denying the Motion to Amend.

Finally, appellant urges that the trial court committed "clear error" in finding that the note involved had been paid. In its memorandum, the trial court discussed in detail much of the evidence relating to the written guaranty and the applicable law of suretyship, and concluded that the guaranty involved was "special" as distinguished from "general". Due to indecisiveness of testimony concerning the place of delivery of the written guaranty, the trial court stated: " * * * the question of which state law (Kansas or Missouri) is to govern is not completely resolvable, on the record before the court". Thereafter the trial court discussed the general rules of law relative to the enforcement and assignability of special guaranties, and the then existing law of Kansas and Missouri, respectively. The court concluded: "The Missouri courts have adopted the rule that a special guaranty may be assigned after the cause of action has arisen on the original obligation, although it is not assignable before that time. (Citations.) From the little Kansas law that exists on the subject of general and special guaranties, this court presumes that Kansas would follow the general rule that special guaranties are not enforcible by other than the person to whom addressed, and may not be assigned." The

importance and significance of the trial court's finding that the note had been paid becomes apparent in the light of that court's following statement: " * * it is our conclusion that the guaranty from Roberts to the Bank was a special guaranty to pay the loan to the Bank, and that even recognizing the rule of law that such a guaranty might be assignable after the cause of action arose, that it was not assignable after the Bank's cause of action was clearly extinguished by the payment of the note."

Appellant does not challenge the correctness of the trial court's determination that this was a "special" guaranty, or the conclusions of that court with regard to the existing laws of Kansas and Missouri relating to the assignability or non-assignability of a "special" guaranty, either before or after a cause of action has arisen on the principal obligation. Appellant's attack is directed squarely at the trial court's finding that payment of the note had in fact been made prior to its purported assignment by the Bank to appellant. Thus, a fact issue is here presented which cannot be set aside unless it is clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure.

" * * * since the issue presented a question of fact, our function on appeal is to determine whether the trial court's findings are clearly erroneous * * *." Reserve Rural High School District No. 4, Brown County, Kansas v. Hanika et al., 8 Cir., 339 F.2d 788, 791.

The general rule relating to the performance of that function is well expressed by this Court in Cole v. Neaf et al., 334 F.2d 326, at page 329, in the following language:

"In actions tried to a court without a jury, Fed.R.Civ.P. 52(a) expressly places the responsibility upon the trial court for resolving doubtful fact issues. We are not privileged to try the case de novo and substitute our judgment for that of the trial court. Findings of fact can be set aside only upon clear demon-

stration that they are without substantial evidentiary support or that they are induced by an erroneous view of the law. (Citations.)"

In discussing the question here presented, we said, in Ashley v. United States, 326 F.2d 499, at page 500:

"United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), teaches that: 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' "

Also see: Hartford Accident and Indemnity Company v. Shaw et al., 8 Cir., 273 F.2d 133, 137; and Apex Mining Company, Inc. v. Chicago Copper & Chemical Company, 8 Cir., 340 F.2d 985, 987.

Bearing the applicable principles in mind, we have carefully reviewed the evidence of record. The maker of the note in question was Investment Corporation of Missouri; after delivery of the executed note and certain collateral (consisting of the note of Woodridge Corporation, trust deed and title insurance policy on each of eight lots involved) to the Bank, and the deposit of the loan proceeds to the credit of said Investment Corporation, the guaranty was executed and delivered. Such guaranty was, of course, no part of the note—it was strictly a collateral agreement between the Bank and the individual officers of the corporate maker of the note. The record discloses no evidence that appellant had any knowledge that a guaranty was contemplated, and it is evident that the insurance policies were not issued in reliance upon such a guaranty. The following portion of the trial court's memorandum refers to certain evidence considered by it and, to some extent, indicates its reasoning:

"In this instance, the note to the Bank was the primary obligation of the Investment Corporation; that of the defendant Roberts was secondary. The Standard Title Insurance Company had no obligation on the note. Its obligation arose under its title insurance policies issued on the lots covered by the deeds of trust which had been put up as security.

"When the note became due and after due notice to the maker and to the guarantors, it elected to proceed against the collateral and make demand upon the Standard Title Insurance Company.

"The Standard Title Insurance Company elected to pay the note and proceed under its assignment from the Bank to foreclose the deeds of trust and sue on the guaranty. Although the plaintiff maintains, and the assignment agreement states, that the note was assigned to the plaintiff, the note itself is in evidence, and rather than indicating assignment or negotiation, it is marked *paid* on the reverse side.

"A paid note is merely a receipt and evidence of a cancelled obligation. It would appear that after the payment of the note, the Bank would no longer have a cause of action to assign."

One of appellant's witnesses was Robert R. Osborn, who testified, on direct and cross-examination, that he was, at time of trial and had been for approximately five years prior thereto, the President of Patrons Cooperative Bank; that he had been associated with said Bank since 1937 and had been in the banking business since 1922; and that he was the bank officer who was personally active in the negotiations leading to the making of the loan here involved, and in the proceedings resulting in the payment of the unpaid balance of the note. In his testimony the following questions and answers appear:

"Q. Actually you made a claim under the title policy for a part of the collateral to the Title Company?

A. Yes, sir.

Q. The bank has been paid in full by Standard Title Company?

A. That is correct."

Each title policy, by its terms, inured to the benefit of the holder of the respective note secured by the mortgage

or deed of trust described therein (and also to any other who acquired the land described in satisfaction of said note or indebtedness). The note was, on the back thereof, marked "6/26/61 Pd by Standard Title Co. $26024.00 Int of $1571.00".

It is apparent that the trial court was influenced in his decision on this issue by the action taken with reference to the marking on the note as bearing upon the intention of the participating parties, for in his memorandum appear the following comments:

> "We are not passing upon the question of what the liability might be if the Bank had simply seen fit to endorse the note to the surety company, but when it marked the note 'Paid' and transferred it to the Title Company under a collateral agreement, assigning all of its collateral, then we believe that no cause of action existed at the time of such transfer, and that the Title Company is not entitled to recover against the defendant under the terms of the guaranty."

As trier of the facts, the trial court had the benefit of seeing the witnesses on the witness stand, hearing their testimony, and examining the documentary evidence. The fact that the Bank representative in this vital transaction was its President, personally familiar with all previous negotiations relating to the loan, and a gentleman having many years of experience in the banking business, may well have been considered by the fact trier. That the action taken in marking the note "Paid" was in accord with the intention of the Bank and the appellant, and in accord with usual banking procedure would, under the existing circumstances, be a reasonable and fair inference.

Viewed in the light of all of the evidence, and after weighing all of the conflicting evidence and inferences which may reasonably be drawn therefrom, we are convinced that Judge Duncan's finding here challenged has substantial evidentiary support and is not clearly erroneous.

Affirmed.